IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TONY FOX, )
    Plaintiff, )
 )
v. ) No. 1:10cv399
 )
PORTICO REALITY SERVICES OFFICE, )
    Defendant. )

FILED AUG - 6 2010

## MEMORANDUM OPINION

In this Title VII race discrimination suit,[1] an Alaska limited liability company with its principal and sole place of business in Virginia, claims it is exempt from the strictures of Title VII pursuant to the Alaska Native Claims Settlement Act ("ANCSA")[2] because it has an indirect, third-tier subsidiary relationship with a Native Corporation. This claim was initially rejected on the ground that the ANCSA exemption, codified at 43 U.S.C. § 1626(g), applies only to Native Corporations and to entities in which the Native Corporation has at least a *direct* 25% ownership interest. *See Fox v. Portico Reality Servs. Office (Fox I)*, --- F. Supp. 2d ----, 1:10cv399 (E.D. Va. June 28, 2010) (Order). Now, defendant seeks reconsideration of this Order, arguing that although it is not directly owned by a Native Corporation, it is nonetheless an "affiliate" of that corporation and therefore is exempt from Title VII under § 1626(g). The matter was fully briefed

---

[1] Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e to 2000e-17 (2006), prohibits discrimination on the basis of race, color, religion, sex, or national origin by statutorily defined "employers." *See* 42 U.S.C. § 2000e-2(a).

[2] Pub. L. No. 92-203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601-1629a (2006)). Congress enacted the ANCSA in 1971 to resolve land disputes between the federal government and the state of Alaska and certain inhabitants, both native and non-native. Under the Act, Native Alaskans received approximately forty-four million acres of land and $1 billion in exchange for extinguishing their aboriginal title. To manage these resources, the ANCSA created thirteen Alaska Native Regional Corporations. *See generally Stratman v. Leisnoi, Inc.*, 545 F.3d 1161, 1163 (9th Cir. 2008).

and argued by counsel[3] at an August 6, 2010 hearing, at which time the matter was resolved by a Bench ruling. This Memorandum Opinion memorializes and further elucidates the Bench ruling.

## I.

The following material facts were undisputed on summary judgment:

1. Plaintiff, an African-American male, is a resident of Virginia.

2. Defendant Portico Reality Services Office[4] is an Alaska limited liability company with its principal place of business in Manassas, Virginia. According to its website, defendant "provides Construction, Facilities Maintenance and Real Estate solutions to the Commercial Industry, Federal, State and Local Governments."

3. Defendant has one sole member, Qivliq LLC, which is headquartered in Herndon, Virginia. Qivliq LLC, in turn, is a wholly-owned subsidiary of NANA Development Corporation, which is a wholly-owned subsidiary of NANA Regional Corporation. NANA Regional Corporation is an Alaska Native Regional Corporation formed pursuant to the ANCSA. In sum, therefore, defendant is an indirect, third-tier subsidiary of NANA Regional Corporation.

4. Plaintiff alleges in his complaint that he was hired to serve as a foreman at defendant's Manassas, Virginia office on September 19, 2007. While employed by defendant, plaintiff was allegedly treated differently from other non-African-American employees in that, *inter alia*, he (i) was not given a company vehicle, (ii) was not reimbursed for travel expenses, (iii) was not given an opportunity to work as a foreman, despite being hired for that position, (iv) was forced to work through his lunch breaks, (v) was the subject of numerous offensive racial remarks, and (vi) was not given a regularly-scheduled pay raise. Plaintiff further alleges that he was

---

[3] On summary judgment, plaintiff had not yet retained counsel and thus proceeded *pro se*. Following the denial of summary judgment, plaintiff was appointed counsel pursuant to 42 U.S.C. § 2000e-5(f)(1)(B). *See Fox v. Portico Reality Servs. Office*, No. 1:10cv399 (E.D. Va. July 12, 2010) (Order). Thereafter, plaintiff filed an opposition brief to the motion at bar and appeared, by counsel, at the August 6, 2010 hearing.

[4] As previously noted in the Order denying summary judgment, defendant refers to itself as "Portico *Realty* Services," rather than "Portico *Reality* Services Office," the latter being the style of plaintiff's complaint and thus the docketed style of the case.

> wrongfully and discriminatorily discharged on October 12, 2009.

5. Following the denial of his administrative claim by the Equal Employment Opportunity Commission ("EEOC") and the issuance of a right to sue letter, plaintiff on April 21, 2010, filed a timely complaint alleging discrimination on the basis of race, in violation of Title VII.

On these facts, defendant moved for summary judgment, arguing that it is exempt from Title VII under § 1626(g) by virtue of its indirect relationship with NANA Regional Corporation. The June 28, 2010 Order denying summary judgment held that the Native Corporation exemption applied only to the Native Corporation itself and to its *direct* subsidiaries, but not to the Native Corporation's *indirect* subsidiaries, principally for three reasons: (i) § 1626(e) specifically references both direct and indirect subsidiary corporations in setting forth the requirements for "minority and economically disadvantaged business enterprise" status, yet § 1626(g) does not; (ii) the Supreme Court has held that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary"[5]; and (iii) practical and public policy considerations further support a direct ownership requirement. *See Fox I*, --- F. Supp. 2d ----, No. 1:10cv399, at 4-6.

Now, on motion for reconsideration, defendant raises a statutory argument focusing on the word "affiliates," as used in § 1626(g), and the language of § 1626(e).[6] More specifically,

---

[5] *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).

[6] Although defendant does not specify the procedural basis for its motion for reconsideration, it is worth noting that "every order short of a final decree is subject to reopening at the discretion of the district judge." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) ("Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment."). Simply put, "[t]he

defendant first argues that the ordinary meaning of the word "affiliates" includes indirect subsidiaries, and hence the plain language of § 1626(g) exempts Native Corporations' indirect subsidiaries from Title VII's prohibition against discrimination on the basis of race, color, religion, sex, or national origin. In addition, defendant also argue that § 1626(e)(2) describes circumstances in which a Native Corporation's indirect subsidiary is "owned and controlled" by the Native Corporation "for all purposes of Federal law," and therefore § 1626(g) reaches Native Corporations' indirect subsidiaries by virtue of § 1626(e).

## II.

### A.

Well-settled principles govern this question of statutory interpretation. Of course, the analysis "begin[s], as always, with the language of the statutory text," and "[i]n the absence of a definition from Congress, we accord words in a statute their ordinary, contemporary, common meaning." *United States v. Midgett*, 198 F.3d 143, 145-46 (4th Cir. 1999) (internal citation and quotation marks omitted). As the Supreme Court has counseled, however, "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincents Hosp.*, 502 U.S. 215, 221 (1991). And although ordinarily "judicial inquiry is complete" where "the terms of [a] statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation," legislative history may be considered (i) "where a literal reading of [the] statute [will] produce a result demonstrably at odds with the intentions of its drafters"; (ii) "where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose

---

ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *Id.* at 515.

of the statute"; or (iii) "where an absolutely literal reading of a statutory provision is irreconcilably at war with the clear congressional purpose, [in which case] a less literal construction . . . [may] be considered." *United States v. Morrison*, 844 F.2d 1057, 1064 (4th Cir. 1988) (first alteration not in original) (citations and quotation marks omitted). At bottom,

> [i]f the language is ambiguous, in that it lends itself to more than one reasonable interpretation, the court's obligation is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested.

*United States v. Joshua*, 607 F.3d 379, 384 (4th Cir. 2010).

Although questions of statutory interpretation often yield to plain language analysis, this is not the case with respect to the term "affiliates"; in this context, the term is ambiguous as to whether it applies to a Native Corporation's indirectly owned affiliates. The principal reason for this contextual ambiguity is found in § 1626(g), which states that

> [f]or the purposes of implementation of the Civil Rights Act of 1964, a Native Corporation and corporations, partnerships, joint ventures, trusts, or *affiliates* in which the Native Corporation *owns* not less than 25 per centum of the equity shall be within the class of entities excluded from the definition of "employer" by [42 U.S.C. § 2000e(b)(1)], as amended, or successor statutes.

43 U.S.C. § 1626(g) (emphases added). Neither "affiliates" nor "owns" is a statutorily defined term, and thus these words must be accorded their ordinary, common meanings. To be sure, as defendant correctly asserts, the word "affiliates" has been found in other contexts to refer to both direct and indirect subsidiaries.[7] In this context, however, the word "affiliates" is ambiguous

---

[7] For instance, the Ninth Circuit recently held that

> [t]he term "affiliate" carries its own, independent legal significance. "Affiliate refers to a 'corporation that is related to another corporation by shareholdings or other means of control . . . .'" *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) (quoting Black's Law

because § 1626(g) applies only where the *Native Corporation*—and not another entity either directly or indirectly owned by the Native Corporation—"owns" twenty-five percent of the equity in the affiliate. *See* 43 U.S.C. § 1626(g) (requiring that "the *Native Corporation* own[] not less than 25 per centum of the equity" (emphasis added)). With respect to the word "owns," the Supreme Court, resolving a similar interpretive question in a different context, has held that the State of Israel did not "own" certain companies within the meaning of the Foreign Sovereign Immunities Act[8] because "these companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Simply put, "the parent [company] does not own or have legal title to the subsidiaries of the subsidiary." *Id.* at 475. There is no reason to conclude that a different result should be reached here, and thus NANA Regional Corporation cannot be said to "own"

---

Dictionary 59 (7th ed. 1999)). The plain and ordinary meaning of "affiliate" supports this definition as "a company effectively controlled by another or associated with others under common ownership or control." Webster's Third New International Dictionary 35 (2002).

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (second alteration in original). In addition, the term "affiliate" is uniformly defined elsewhere in the U.S. Code to include direct and indirect subsidiaries. *See, e.g., Sec. & Exch. Comm'n v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006) ("The definition of 'affiliate' [for purposes of the Securities Act of 1933] includes 'any person directly or indirectly controlling or controlled by an issuer.'" (quoting 15 U.S.C. § 77b(a)(11))); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 316 (2d Cir. 2005) ("[T]he Banking Act of 1933 . . . codif[ied] the term 'affiliate' to 'include any corporation, business, trust, association, or similar organization' that is directly or indirectly controlled by a 'member bank.'").

[8] The Foreign Sovereign Immunities Act defines a "foreign state" to include political subdivisions and agencies or instrumentalities of a foreign state. 28 U.S.C. § 1603(a). "[A]gency or instrumentality of a foreign state," in turn, includes "an organ of a foreign state or political subdivisions thereof, or a majority of whose shares or other ownership interest the foreign state or political subdivision is *owned* by a foreign state or political subdivision." 28 U.S.C. § 1603(b)(2) (emphasis added).

defendant indirectly through two other subsidiaries.

Accordingly, the use of the word "owns" in § 1626(g) operates to create an ambiguity as to the meaning of "affiliates" because the statute "lends itself to more than one reasonable interpretation." *Joshua*, 607 F.3d at 384. On the one hand, the use of the word "affiliates" may be interpreted to extend the Title VII exemption to Native Corporations' indirect subsidiaries by implicitly modifying and broadening the meaning of the word "owns," as understood by the Supreme Court in another context. On the other hand, the use of the word "owns" may be interpreted as modifying and narrowing the meaning of the word "affiliates," thus subjecting Native Corporations' indirect subsidiaries to the strictures of Title VII. Given this contextual ambiguity, it remains "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *Id.* at 384.

Ultimately, several factors counsel in favor of limiting the scope of § 1626(g) to Native Corporations' direct subsidiaries. To begin with, the fact that § 1626(e) refers to "direct and indirect" subsidiaries, while § 1626(g) lacks such language, is significant because "it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion" of statutory terms. *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005). This presumption is strengthened by the fact that these subsections were enacted simultaneously. *See Reno v. Koray*, 515 U.S. 50, 56-57 (1995) (holding that 18 U.S.C. § 3585(b) must be construed in conjunction with the Bail Reform Act because "the Bail Reform Act of 1984 was enacted in the same statute as the Sentencing Reform Act of 1984, of which § 3585 is a part"). From this, it is reasonable to conclude that had Congress intended § 1626(g) to reach indirect subsidiaries, it

would have stated so expressly as it did in § 1626(e), rather than implying that result through use of the word "affiliates." Likewise, Congress could have, but did not, define the word "affiliates" to include indirect subsidiaries for purposes of the ANCSA ,[9] even though such an express definition has been provided in other contexts. *See supra* note 7.

In addition, it is useful and appropriate to consider the purpose of § 1626(g) in resolving the contextual ambiguity presented by the statutory language. The Senate Report accompanying the legislation enacting § 1626(g) states that "[s]ubsection (g) is intended to facilitate Alaska Native shareholder employment programs by resolving any uncertainty as to the applicability of the Civil Rights Act of 1964 to certain business enterprises in which Native Corporations participate." Sen. Rep. No. 100-201, at 39 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3269, 3290. Thus, courts have held that "the ANC exemption was necessary to permit a [Native Corporation] to have a Native American employment preference." *Pearson v. Chugach Gov't Servs.*, 669 F. Supp. 2d 467, 472 (D. Del. 2009); *see also Malabed v. N. Slope Borough*, 42 F. Supp. 2d 927, 934 (D. Alaska 1999) ("[E]ach of the hundreds of village corporations and the dozen regional corporations may discriminate in favor of Native Americans without violating Title VII."). Significantly, in interpreting § 1626(g), courts have also held that Title VII exemptions, including § 1626(g), must be narrowly interpreted. *See, e.g., Pearson*, 669 F. Supp. 2d at 470-73 (noting narrowness of Native American and Alaska Native Title VII exemptions).

In response, defendant emphasizes that the Supreme Court has recognized a relevant countervailing interest, namely that "statutes are to be construed liberally in favor of the Indians,

---

[9] 43 U.S.C. § 1602 (providing definitions for terms used in the ANCSA).

with ambiguous provisions interpreted to their benefit,"[10] and that this principle requires in this case a broad construction of § 1626(g) that reaches Native Corporations' distant, indirect subsidiaries. This argument stretches the Supreme Court's statement too far. Although, as a general matter, statutes must be construed in favor of Native Americans, including Alaska Natives, any interpretation must remain faithful to a statute's context and purpose. Indeed, the Fourth Circuit has held that the § 1626(g) Title VII exemption cannot be read so broadly as to exempt Native Corporations from discrimination cases brought pursuant to 42 U.S.C. § 1981. *See Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 212 (4th Cir. 2007) (rejecting argument that "employer exceptions in Title VII must be read broadly if they are to serve their purpose"). To be sure, permitting Native Corporations' distant, indirect subsidiaries to discriminate in the workplace on the basis of race, color, religion, sex, or national origin under either Title VII or § 1981 may be "beneficial" to Native Corporations and their direct and indirect subsidiaries, in the sense that they would be immune from civil liability for such discriminatory acts. Yet, it is clear that Congress did not intend such a result in enacting § 1626(g); rather, Congress simply sought to clarify that Native Corporations do not violate Title VII by favoring Alaska Natives when hiring personnel. *See Pearson*, 669 F. Supp. 2d at 472.

Limiting the scope of § 1626(g) to Native Corporations' direct subsidiaries, and subjecting Native Corporations' indirect subsidiaries to Title VII, is the statutory interpretation most faithful to § 1626(g)'s clear purpose. As noted in the Order denying summary judgment, "to hold otherwise would permit subsidiaries of subsidiaries of subsidiaries—which are only

---

[10] *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (citation and quotation marks omitted).

tenuously related to a Native Corporation and indeed may not even operate in Alaska—to evade Title VII's prohibition on employment discrimination, thereby contravening the purposes of both the ANCSA and Title VII." *Fox I*, --- F. Supp. 2d ----, No. 1:10cv399, at 6. Indeed, to accept defendant's argument would be to impute to Congress an intent to allow companies only distantly related to a Native Corporation to engage in racial, gender, national origin, or religious discrimination in the workplace with impunity, regardless of whether the subsidiary has any appreciable relationship with a Native Corporation or even employs Alaska Natives. No such intent can be imputed to Congress. In this case, although the summary judgment record was anemic as to defendant's and its parent companies' hiring practices, it is doubtful that NANA Regional Corporation's Colorado, Georgia, North Carolina, and Virginia indirect subsidiaries[11]—including defendant—are employing Alaska Natives or even considering them for employment, and thus it makes little sense to exempt these indirect subsidiaries from Title VII altogether. *See Pearson*, 669 F. Supp. 2d at 472 ("This evolution of ANCs into open-market

---

[11] Defendant submits documents establishing that the EEOC, citing § 1626(g), has previously dismissed administrative Title VII complaints against NANA Regional Corporation's indirect subsidiaries, which operate in these states. Although defendant correctly concedes that these EEOC administrative determinations are not binding here, defendant nonetheless argues that these decisions "should not be devoid of persuasive force" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Yet, *Skidmore* and prior EEOC administrative determinations are inapposite here. This civil suit does not seek review of agency action, and accordingly the EEOC's prior interpretations of § 1626(g) are afforded no deference. *See Dahlberg v. Avis Rent a Car Sys.*, 92 F. Supp. 2d 1091, 1108 (D. Col. 2000) ("Dahlberg's title III claim is not a review of agency action under the Administrative Procedures Act and this court is not required to defer to the Justice Department's interpretation of the ADA . . . ."). Even assuming *Skidmore* deference applies here, the EEOC's cursory and conclusory one-sentence determinations, amounting to little more than a citation to the ANCSA, would carry little persuasive force. *See Skidmore*, 323 U.S. at 140 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

interstate commercial organizations, including employment of non-Native Americans, raises new questions about the scope of the ANC exemption."). To be sure, Native Corporation's abuse of § 1626(g) is not foreclosed by limiting the exemption's scope to direct subsidiaries, but a narrow interpretation of the statute appropriately cabins the exemption and guards against widespread abuse by requiring less separation and a greater degree of control between the Native Corporation and its subsidiary.

Importantly, this statutory construction does not render the word "affiliates" meaningless in § 1626(g). *See Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 244 (4th Cir. 2009) (noting duty "to give effect to all operative portions of the enacted language" (citation and quotation marks omitted)). The word "affiliates," when read in context, sensibly indicates that the types of business entities listed—namely "corporations, partnerships, joint ventures, [and] trusts"—are not the only entities exempt from Title VII. *Cf. Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 316 (2d Cir. 2005) (holding that "affiliate," as used in the Banking Act of 1933, "include[s] any corporation, business, trust, association, *or similar organization*" (emphasis added) (citation and quotation marks omitted)). Thus, a limited liability company, a business entity distinct from a corporation,[12] that is directly owned by a Native Corporation would be exempt from Title VII under § 1626(g).

In sum, the plain language of § 1626(g) does not resolve the question whether the Title VII exemption extends to Native Corporations' indirect subsidiaries. Nonetheless, the structure of § 1626 and the statutory purpose of § 1626(g) point persuasively to the conclusion that the

---

[12] *See Gen. Tech. Applications, Inc. v. Exro, Ltda*, 388 F.3d 114, 121 (4th Cir. 2004) ("A limited liability company organized under the laws of a state is not a corporation . . . .").

word "affiliates" simply refers to other types of business entities not expressly listed in the statute. Accordingly, the use of the word "affiliates" in § 1626(g) does not imply that Native Corporations' indirect subsidiaries are exempt from Title VII.

### B.

Defendant further argues that § 1626(e) defines "ownership" by a Native Corporation to include both direct and indirect control. Section 1626(e) states, as follows:

> (1) For all purposes of Federal law, a Native Corporation shall be considered to be a corporation owned and controlled by Natives and a minority and economically disadvantaged business enterprise if the Settlement Common Stock of the corporation and other stock of the corporation held by holders of Settlement Common Stock and by Natives and descendants of Natives, represents a majority of both the total equity of the corporation and the total voting power of the corporation for the purposes of electing directors.
> (2) *For all purposes of Federal law, direct and indirect subsidiary corporations, joint ventures, and partnerships of a Native Corporation qualifying pursuant to paragraph (1) shall be considered to be entities owned and controlled by Natives and a minority and economically disadvantaged business enterprise* if the shares of stock or other units of ownership interest in any such entity held by such Native Corporation and by the holders of its Settlement Common Stock represent a majority of both—
> > (A) the total equity of the subsidiary corporation, joint venture, or partnership; and
> > (B) the total voting power of the subsidiary corporation, joint venture, or partnership for the purpose of electing directors, the general partner, or principal officers.

43 U.S.C. § 1626(e) (emphasis added). This argument misinterprets the statutory language and is foreclosed by well-settled principles of statutory construction.

In the first instance, defendant's argument is foreclosed by the plain and unambiguous statutory text. *See Midgett*, 198 F.3d at 145 ("[W]e begin, as always, with the language of the statutory text."). According to defendant, the phrase "direct and indirect subsidiary corporations . . . shall be considered to be entities owned and controlled by Natives and a minority and

economically disadvantaged business enterprise" indicates that direct and indirect subsidiary corporations are considered to be owned and controlled by Native Corporations. Yet, this misreads the statute and conflates two statutorily defined terms, "Natives" and "Native Corporations." The term "Natives" refers to "a citizen of the United States who is a person of one-fourth degree or more Alaska Indian,"[13] while the term "Native Corporations" refers generally to certain types of corporations established under Alaska law.[14] Significantly, the use of "Natives" in § 1626(e) is presumed to be purposeful. *See Soliman*, 419 F.3d at 283 ("[I]t is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."). Thus, the plain language of the statute does not indicate that a Native Corporation's direct and indirect subsidiaries are considered to be owned and controlled by the Native *Corporation*; rather, the statute simply provides that these direct and indirect subsidiaries are Native-owned.

Congress's rationale for referring to "Natives" instead of "Native Corporations" is made clear by considering the structure of § 1626. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must be read as a whole." (citation and quotation marks omitted)). Each § 1626 subsection addresses a different circumstance in which the ANCSA bears on existing federal programs or laws, and in this respect the enactment of § 1626(e)

> further clarif[ied] that Alaska Native Corporation and their subsidiary companies are minority and economically disadvantaged business enterprises for the purposes of qualifying for participation in the federal contracting and subcontracting programs, the largest of which include . . . [the Small Business Administration's "section 8(a)" program] and the Department of Defense Small

---

[13] 43 U.S.C. § 1602(b).

[14] 43 U.S.C. § 1602(m).

and Disadvantaged Business Program.

*AFGE v. United States*, 104 F. Supp. 2d 58, 72-73 (D.D.C. 2000) (alterations in original) (quoting H.R. Rep. No. 102-673, 138 Cong. Rec. 1450, 1456 (1992)). From this, it follows that the prefatory clause to § 1626(e)—"[f]or all purposes of federal law"—refers to federal programs that require, or take into account, the fact that a business entity is minority-owned or economically disadvantaged.[15] Accordingly, contrary to defendant's argument, § 1626(e) does not provide a definition of "ownership" for purposes of § 1626(g), and indeed it is worth noting that the ANCSA provides definitions of statutory terms in another section. *See* 43 U.S.C. § 1602. Instead, § 1626(e) simply confirms Native Corporations'—and their direct and indirect subsidiaries'—eligibility for certain federal programs because they are, by law, deemed to be (i) owned and controlled by *Natives*, as opposed to Native Corporations, and (ii) minority and economically disadvantaged business enterprises.

The same result obtains under the rule against superfluities, which requires courts interpreting statutes "to give effect . . . to every word of a statute"[16] such that "no part will be

---

[15] *See, e.g.*, 12 U.S.C. § 1441a(w)(17)(b) ("[A]ny minority individual, minority-owned business, or a minority depository institution shall be eligible for capital assistance under the minority interim capital assistance program . . . ."); 15 U.S.C. § 637 (directing Small Business Administration "to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals" where certain requirements are met); 42 U.S.C. § 5197h(c) (making nonprofits eligible for grants, contracts, or cooperative agreements where the nonprofit demonstrates partnership with a minority-owned business enterprise); 13 C.F.R. 124.101 ("Generally, a concern meets the basic requirements for admission to the 8(a) BD program if it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals . . . .").

[16] *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citations and quotation marks omitted).

inoperative or superfluous, void or insignificant."[17] In this regard, § 1626(g) states that the Title VII exemption applies to corporations "in which the Native Corporation owns not less than *25 per centum* of the equity." *Id.* (emphasis added). Section 1626(e)(2), by comparison, states that a Native Corporation's direct and indirect subsidiaries are "considered to be entities owned and controlled by Natives and a minority and economically disadvantaged business enterprise" if the Native Corporation and the settlement common stock owners hold a *majority* of the total equity and a majority of the total voting power in the subsidiary corporation. *Id.* § 1626(e)(2). In sum, therefore, § 1626(e) is satisfied where the Native Corporation controls over 50% of a subsidiary, while § 1626(g) is satisfied where the Native Corporation controls at least 25% of a subsidiary. The fact that the two subsections contain different ownership and control thresholds compels the conclusion that § 1626(e) does not dictate when a Native Corporation owns a subsidiary for purposes of § 1626(g) because a contrary interpretation would render the 25% threshold meaningless. If, as defendant contends, ownership of an indirect subsidiary was established only by virtue of holding a majority of the equity and voting power in the subsidiary, as required by § 1626(e), under defendant's reading of § 1626 a Native Corporation holding between 25% and 50% of the equity and voting power of an indirect subsidiary would not own the subsidiary for purposes of either § 1626(e) or 1626(g). This is squarely at odds with the plain language of § 1626(g), which requires only a 25% equity ownership to trigger the Title VII exemption. Stated another way, defendant's argument would, in practice, replace § 1626(g)'s 25% threshold with a 50% threshold, and therefore defendant's statutory interpretation must be rejected as implausible.

---

[17] *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citations and quotation marks omitted).

## III.

This case presents a close question of statutory interpretation. Although the term "affiliates" may, in some contexts, have a plain and unambiguous meaning, this is not the case with respect to the use of the term in § 1626(g); in this context, contextual ambiguity is created by the presence of the term "owns." On the one hand, the statute specifies that a Native Corporation's "affiliates" are exempt from Title VII, and defendant understandably argues that the word "affiliates" in some contexts refers to both direct and indirect subsidiaries. Yet, on the other hand, § 1626(g), by its plain terms, applies only where a Native Corporation "owns" the entity claiming exemption from Title VII, and in this regard the Supreme Court has held in another context that a parent corporation does not "own" indirect subsidiaries under basic principles of corporate law. In light of this ambiguity, construing § 1626(g) to reach only a Native Corporation's direct subsidiaries, and not a Native Corporation's indirect subsidiaries, is most consistent with (i) the structure of § 1626, (ii) the fact that § 1626(e) references "direct and indirect subsidiary corporations" but § 1626(g) does not, and (iii) the clear and limited purpose of § 1626(g), namely to permit Native Corporations to favor Alaska Natives in hiring employees.

Should Congress wish to extend the Title VII exemption to indirect subsidiaries, it should do so explicitly. It is one thing to allow direct and indirect subsidiaries to benefit as minority and economically disadvantaged business enterprises under § 1626(e); but it is quite another to permit Native Corporations' distant, indirect subsidiaries to engage in conduct made unlawful by Title VII—namely discriminatory hiring and discharge, sexual harassment and creation of a hostile work environment, and retaliation—particularly where these indirect subsidiaries neither have an appreciable relationship with a Native Corporation nor hire Alaska Natives. For these

reasons, defendant's motion for reconsideration of the Order denying summary judgment must be denied.

Moreover, plaintiff represents that he may seek leave to amend his *pro se* complaint to add additional claims. The filing of an amended complaint with the aid of counsel will serve to clarify the allegations set forth in plaintiff's *pro se* complaint, and thus will facilitate the timely resolution of this matter. In addition, granting this request will not prejudice the parties because the litigation is still in its early stages. In the circumstances, therefore, plaintiff's request for leave to file an amended complaint is reasonable.[18]

An appropriate Order shall issue.


Alexandria, Virginia
August 6, 2010

```
                                    _____
                                    T. S. Ellis, III
                                    United States District Judge
```

---

[18] Nothing in this Memorandum Opinion expresses any view about the merits of any claim in this case.